[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 02, 2004
THOMAS  K. KAHN
CLERK

Nos. 04-10979
& 04-11044

_____

D. C. Docket No. 02-00139-CV-6

RALPH HARRISON BENNING,

Plaintiff-Appellee,

versus

THE STATE OF GEORGIA,
THE GEORGIA DEPARTMENT OF CORRECTIONS,

Defendants-Appellants,

UNITED STATES OF AMERICA,

Intervenor-Defendant-
Appellee.

_____

Appeals from the United States District Court
for the Southern District of Georgia

_____

**(December 2, 2004)**

Before EDMONDSON, Chief Judge, PRYOR and FAY, Circuit Judges.

PRYOR, Circuit Judge:

The issues presented in this appeal are whether Congress exceeded its authority under the Spending Clause of the Constitution or violated either the Establishment Clause or the Tenth Amendment in enacting section 3 of the Religious Land Use and Institutionalized Persons Act (RLUIPA), which requires state prisons that receive federal funds to refrain from burdening the religious exercise of prisoners. Because Congress properly exercised its spending power by unambiguously conditioning the use of federal funds for state prisons on the related accommodation of the religious exercise of prisoners and that accommodation does not endorse a religious viewpoint, we conclude that this section of RLUIPA was validly enacted under the Spending Clause and does not violate either the Establishment Clause or the Tenth Amendment.

## I. BACKGROUND

Ralph Benning is an inmate in the Georgia prison system. He asserts that he is a "Torah observant Jew" and is "compelled by [his] system of religious belief to eat only kosher food," "wear a yarmulke at all times," "to observe specific holy days," and "perform specific rituals." Benning asked a number of state and prison officials to provide him with a kosher diet and permit him to wear a yarmulke. Prison officials denied Benning's requests. Benning also filed an internal prison

2

grievance in which he specifically asserted his rights under RLUIPA. Benning's grievance failed.

Benning filed this lawsuit against Georgia, the Georgia Department of Corrections (DOC), and several Georgia officials. Georgia moved to dismiss and argued that section 3 of RLUIPA, 42 U.S.C. section 2000cc-1, exceeds the authority of Congress under the Spending and Commerce Clauses, and violates the Tenth Amendment and the Establishment Clause. The United States intervened to defend the constitutionality of RLUIPA.

The district court dismissed Benning's claims against the individual defendants, but concluded that RLUIPA does not violate the Establishment Clause and denied the motion to dismiss with regard to Georgia and the DOC. The district court certified its denial of the motion to dismiss for immediate appeal, under Federal Rule of Civil Procedure 54(b), and alternatively certified its ruling for interlocutory appeal under 28 U.S.C. section 1292(b). We granted the petition by Georgia for permission to appeal under section 1292(b).

## II. STANDARD OF REVIEW

We review <u>de novo</u> the constitutionality of an act of Congress. <u>Gulf Power Co. v. United States</u>, 187 F.3d 1324, 1328 (11th Cir. 1999). Georgia has the burden to show that section 3 of RLUIPA is unconstitutional. "Proper respect for

3

a co-ordinate branch of the government requires the courts of the United States to give effect to the presumption that [C]ongress will pass no act not within its constitutional power. This presumption should prevail unless the lack of constitutional authority to pass an act in question is clearly demonstrated." United States v. Harris, 106 U.S. 629, 635, 1 S. Ct. 601, 606 (1883). As the Supreme Court explained in United States v. Morrison, "we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." 529 U.S. 598, 607, 120 S. Ct. 1740, 1746 (2000). Because this is a facial challenge to section 3, Georgia must also show that there is no set of circumstances in which section 3 can be applied without violating the Constitution:

> A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself. The general rule is that for a facial challenge to a legislative enactment to succeed, the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that a legislative act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid. This heavy burden makes such an attack the most difficult challenge to mount successfully against an enactment.

Horton v. City of St. Augustine, 272 F.3d 1318, 1329 (11th Cir. 2001) (internal quotation marks and citations omitted).

4

## III. DISCUSSION

Section 3 of RLUIPA applies strict scrutiny to government actions that substantially burden the religious exercise of institutionalized persons:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person–
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.
> ...
> This section applies in any case in which–
> (1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or
> (2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.

42 U.S.C. § 2000cc-1. Although we upheld section 2, the land use section of RLUIPA, 42 U.S.C. section 2000cc(a)(1) and (b), as constitutional in Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214 (11th Cir. 2004), the constitutionality of section 3 is an issue of first impression in this circuit.

Four of our sister circuits have considered the constitutionality of this section, and three have upheld it. The Seventh and Ninth Circuits have concluded that section 3 of RLUIPA is a valid exercise of the spending power of Congress and does not violate the Establishment Clause or the Tenth Amendment. Charles

5

v. Verhagen, 348 F.3d 601 (7th Cir. 2003); Mayweathers v. Newland, 314 F.3d 1062 (9th Cir. 2002). The Fourth Circuit has also upheld section 3 under the Establishment Clause. Madison v. Riter, 355 F.3d 310 (4th Cir. 2003). Only the Sixth Circuit has held that section 3 violates the Establishment Clause. Cutter v. Wilkinson, 349 F.3d 257 (6th Cir. 2003).

Georgia argues that Congress, in enacting section 3 of RLUIPA, exceeded its authority under Article I, section 8, and, alternatively, violated either the First Amendment or the Tenth Amendment. Although both Benning and the United States argue that Congress acted within its authority under both the Spending Clause and the Commerce Clause, we need not address both arguments so long as Congress validly exercised either source of authority. We address the authority of Congress under the Spending Clause before turning to the objections Georgia raises under both the First and Tenth Amendments.

*A. Congress Properly Exercised Its Spending Power.*

The Constitution empowers Congress to "lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States." U.S. Const. Art. I, § 8, cl. 1. It is well-settled that "[i]ncident to this power, Congress may attach conditions on the receipt of federal funds." South Dakota v. Dole, 483 U.S. 203, 206, 107 S. Ct.

2793, 2795-96 (1987). This power can be exercised to achieve goals not within the other enumerated powers of Congress in Article I, id. at 207, 107 S. Ct. at 2796, but this power is also limited.

The Supreme Court has identified four restrictions on the spending power of Congress. First, conditions attached by Congress on the expenditure of federal funds must promote the general welfare, and not be in the service of narrow and private interests. Id. Second, conditions on the state receipt of federal funds must be unambiguous, and enable "the States to exercise their choice knowingly, cognizant of the consequences of their participation." Id. Third, the Supreme Court has "suggested (without significant elaboration) that conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." Id. (internal quotation marks and citations omitted). Fourth, no condition attached to receipt of federal funds may violate other provisions of the Constitution. Id. at 208, 107 S. Ct. at 2796. Georgia does not dispute that RLUIPA serves the general welfare, so we limit our discussion to the three remaining issues.

1. The Conditions of RLUIPA Are Unambiguous.

Congress may condition the expenditures of federal funds on the furtherance of federal objectives, but when the recipient of those funds is a state

7

the conditions imposed by Congress must be unambiguous:

> [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S. Ct. 1531, 1540 (1981) (internal citations omitted).

Georgia argues that the conditions of RLUIPA are ambiguous, contrary to Pennhurst, in four ways: (1) RLUIPA does not put states on clear notice that, by accepting federal funds, they waive immunity to suits brought under the act; (2) RLUIPA does not clearly inform states that they have an option whether to accept or reject federal funds; (3) federal grants do not mention the requirements that RLUIPA will impose on states accepting the grants; and (4) the standard of least restrictive means is too ambiguous to allow a state an informed choice. These arguments fail.

Congress unambiguously required states to waive their sovereign immunity from suits filed by prisoners to enforce RLUIPA. Section 2000cc-2(a) provides that "[a] person may assert a violation of this chapter as a claim or defense in a

judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a). The statutory definition of government specifically includes states and state agencies. 42 U.S.C. § 2000cc-5(4)(A). Georgia was on clear notice that by accepting federal funds for its prisons, Georgia waived its immunity from suit under RLUIPA. "Where Congress has unambiguously conditioned the receipt of federal funds on a waiver of immunity, [our decisions do] not leave open the possibility that a state can continue to accept federal funds without knowingly waiving its immunity." Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1293 (11th Cir. 2003).

Congress need not inform the states of their self-evident ability to decline federal funds nor include within each federal grant a list of all accompanying conditions. It is sufficient for the text of RLUIPA to link unambiguously its conditions to the receipt of federal funds and define those conditions clearly enough for the states to make an informed choice. Pennhurst, 451 U.S. at 25, 101 S. Ct. at 1544. RLUIPA applies in any case in which "the substantial burden is imposed in a program or activity that receives Federal financial assistance." 42 U.S.C. § 2000cc-1(b)(1).

The standard of least restrictive means is far from ambiguous in informing states of their responsibilities when they receive federal funds. RLUIPA forbids

9

the states from imposing substantial burdens on religious exercise absent a compelling government interest accomplished by the least restrictive means necessary to serve that interest. This standard is not new to Georgia or any state. In Midrash, we observed that RLUIPA reanimates the strict scrutiny long applied to the states in disputes regarding the free exercise of religion both before and after Employment Division v. Smith, 494 U.S. 872, 110 S. Ct. 1595 (1990). Midrash, 366 F.3d at 1236-37. RLUIPA gives states wide latitude in applying its provisions, but this flexibility does not make the conditions of RLUIPA opaque. "[O]nce Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper." Sandoval v. Hagan, 197 F.3d 484, 495 (11th Cir. 1999), overruled on other grounds, Alexander v. Sandoval, 532 U.S. 275, 121 S. Ct. 1511 (2001).

The Supreme Court has explained that so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely. In Davis v. Monroe County Board of Education, for example, the Court upheld the prohibition of sexual harassment in schools that receive federal funds, under Title IX, and its corresponding right of action, even though "the level of actionable 'harassment' ... 'depends on a

constellation of surrounding circumstances, expectations, and relationships,' ... including but not limited to, the ages of the harasser and the victim and the number of individuals involved .... " 526 U.S. 629, 651, 119 S. Ct. 1661, 1675 (1999) (quoting Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 82, 118 S. Ct. 998, 1003 (1998)).  The clear prohibition of discrimination in Title IX provided adequate notice to the recipients of federal funds that severe student-on-student harassment was actionable.  Id.

Georgia erroneously relies on Pennhurst to support its argument that RLUIPA is ambiguous.  In Pennhurst, a federal suit failed when the plaintiffs argued that a federal law that declared "a right to appropriate treatment" for certain patients "provided in the setting that is least restrictive of the [patient's] individual liberty" created a substantive right against the states.  Pennhurst, 451 U.S. at 14, 101 S. Ct. at 1538.  The Court reasoned, "It is difficult to know what is meant by providing 'appropriate treatment' in the 'least restrictive' setting, and it is unlikely that a State would have accepted federal funds had it known it would be bound to provide such treatment."  Id. at 24-25, 101 S. Ct. at 1543-44.  "Congress fell well short of providing clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with [the treatment standards]."  Id. The federal law in Pennhurst was unclear as to whether the states incurred any

11

obligations at all by accepting federal funds, but RLUIPA is clear that states incur an obligation when they accept federal funds, even if the method for compliance is left to the states. Pennhurst does not require more.

Our sister circuits that have considered this question reached the same conclusion. In Mayweathers, the Ninth Circuit stated, "Congress is not required to list every factual instance in which a state will fail to comply with a condition. Such specificity would prove too onerous, and, perhaps, impossible. Congress must, however, make the existence of the condition itself–in exchange for the receipt of federal funds–explicitly obvious." Mayweathers, 314 F.3d at 1067. The Seventh Circuit explained, "Congress permissibly conditioned the receipt of federal money in such a way that each State is made aware of the condition and is simultaneously given the freedom to tailor compliance according to its particular penological interests and circumstances." Charles, 348 F.3d at 608. No federal appellate court has held to the contrary, and we decline to be the first.

2. RLUIPA is Rationally Related to a Federal Interest.

Georgia erroneously argues that the federal grants for its prisons are unrelated to the objectives of RLUIPA. Georgia relies on the statement in Dole that the Court has "suggested (without significant elaboration) that conditions on federal grants might be illegitimate if they are unrelated to the federal interest in

12

particular national projects or programs." Dole, 483 U.S. at 207, 107 S. Ct. at 2796 (internal citations omitted). The problem with this argument is that the United States has a substantial interest in ensuring that state prisons that receive federal funds protect the federal civil rights of prisoners.

Congress has every right to ensure that the state prisons that accept federal funds respect the religious freedom of prisoners and promote their rehabilitation:

> Congress has a strong interest in making certain that federal funds do not subsidize conduct that infringes individual liberties, such as the free practice of one's religion. The federal government also has a strong interest in monitoring the treatment of federal inmates housed in state prisons and in contributing to their rehabilitation. Congress may allocate federal funds freely, then, to protect the free exercise of religion and to promote rehabilitation. If the Supreme Court has in fact imposed a low-threshold relatedness test, RLUIPA satisfies it.

Mayweathers, 314 F.3d at 1067; see also Charles, 348 F.3d at 608-09.

The warning in Dole that Spending Clause legislation "might be illegitimate" if it is "unrelated" to the purpose of the federal spending program, Dole, 483 U.S. at 207, 107 S. Ct. at 2796, and the guidance in New York v. United States, 505 U.S. 144, 167, 112 S. Ct. 2408, 2423 (1992), that Spending Clause legislation should bear "some relationship to the purpose of the federal spending," establish a minimal standard of rationality. RLUIPA easily satisfies this standard. Both the protection of the religious exercise of prisoners and their rehabilitation

13

are rational goals of Congress, and those goals are related to the use of federal funds for state prisons.

Georgia fails in its argument that highway safety, the federal interest in Dole, was tied more closely to the funding condition that states raise their legal drinking age to 21 than the funding of prisons is tied to the objectives of RLUIPA. The connection between raising the drinking age and highway funds is no more related than the connection between accommodating the religious exercise of prisoners and correctional funds. Mayweathers, 314 F.3d at 1067; Charles, 348 F.3d at 608-09. If anything, the protection of the free exercise of religion, a civil right guaranteed by the First Amendment, is a more substantial federal interest than highway safety.

Georgia also wrongly argues that the extensive conditions imposed by RLUIPA are not in proportion to the small amount of federal funds dedicated to state correctional systems. Georgia relies on Rust v. Sullivan, 500 U.S. 173, 111 S. Ct. 1759 (1990), and FCC v. League of Women Voters, 468 U.S. 364, 104 S. Ct. 3106 (1984), in support of this argument. Although both of those decisions briefly discussed the Spending Clause, the holdings of the Court turned on statutory conditions that violated the free speech rights of individual citizens. Neither decision involved conditions imposed on the receipt of federal funds by

states.  As the Seventh Circuit stated in Charles, both Rust and League of Women Voters "are inapposite; they do not even concern the Spending Clause."  Charles, 348 F.3d at 601.

The Seventh Circuit also correctly explained in Charles that there is no standard of proportionality for spending legislation:

> Nothing within Spending Clause jurisprudence, or RLUIPA for that matter, suggests that States are bound by the conditional grant of federal money only if the State receives or derives a certain percentage ... of its budget from federal funds.  If a State wishes to receive any federal funding, it must accept the related, unambiguous conditions in their entirety.

Id.  Likewise, Georgia cannot accept federal funds and then attempt to avoid their accompanying conditions by arguing that the conditions are disproportionate in scope.

B. *The Proper Use of Spending Power Does Not Violate the Tenth Amendment*.

Georgia next erroneously argues that the Tenth Amendment provides an independent constitutional bar because RLUIPA interferes with a core state function of administering prisons.  If the enactment of RLUIPA is within an enumerated power of Congress, however, the Tenth Amendment does not apply.  Midrash, 366 F.3d at 1242.  Because we have already concluded that RLUIPA is valid spending legislation, this argument fails.

Georgia alternatively argues that RLUIPA invades the regulatory purview of states so extensively as to violate the Tenth Amendment, but this argument is undermined by our recent precedent. In Midrash, this Court held that RLUIPA does not violate the Tenth Amendment. Although RLUIPA "may preempt laws that discriminate against or exclude religious institutions entirely, it leaves individual states free to eliminate the discrimination in any way they choose, so long as the discrimination is actually eliminated." Midrash, 366 F.3d at 1242. "RLUIPA's core policy is not to regulate the states or compel their enforcement of a federal regulatory program, but to protect the exercise of religion, a valid exercise of [the power of Congress], which does not run afoul of the Tenth Amendment's protection of the principles of federalism." Id. at 1243. Midrash guides us, even though the authority for section 3 of RLUIPA is found in the Spending Clause, and the authority for section 2, which was at issue in Midrash, is found in Section Five of the Fourteenth Amendment. Because RLUIPA does not compel the states to regulate in a specific manner and is a valid exercise of a power of Congress, RLUIPA does not violate the Tenth Amendment. See also Charles, 348 F.3d at 609; Mayweathers, 314 F.3d at 1069.

C. *RLUIPA Does Not Violate the Establishment Clause*.

Georgia argues that RLUIPA violates the Establishment Clause, under the

three-part test established in Lemon v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105 (1971). The Lemon test requires that statutes have a secular purpose, have a primary effect that neither advances nor inhibits religion, and not entangle excessively government with religion. Id. at 612-13, 91 S. Ct. at 2111. We have held that section 2 of RLUIPA does not violate the Establishment Clause, Midrash, 366 F.3d at 1240-42, and three of the four circuits to consider whether section 3 of RLUIPA violates the Establishment Clause have upheld it. Mayweathers, 314 F.3d at 1068-69; Charles, 348 F.3d at 610-11; Madison, 355 F.3d at 315-22; but see Cutter, 349 F.3d at 262-68 (holding section 3 of RLUIPA violates the Establishment Clause). We consider each part of the Lemon test in turn, and conclude that section 3 of RLUIPA does not violate the Establishment Clause.

### 1. RLUIPA Has a Secular Purpose.

The first part of the Lemon inquiry is whether the law in question has a secular purpose. The Supreme Court has explained that a secular purpose need not be hostile or even unrelated to religion:

> This does not mean that the law's purpose must be unrelated to religion – that would amount to a requirement that the government show a callous indifference to religious groups, and the Establishment Clause has never been so interpreted. Rather, Lemon's 'purpose' requirement aims at preventing the relevant government

17

decisionmaker–in this case, Congress–from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.

Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 335, 107 S. Ct. 2862, 2868 (1987) (internal citations omitted).  In Amos, the Court, for example, upheld section 702 of the Civil Rights Act of 1964, which exempts religious organizations from the prohibitions of discrimination in employment on the basis of religion.  The Court held that it was "a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their mission."  Id.

Like section 702 of the Civil Rights Act, RLUIPA advances the secular purpose of "protecting the free exercise of religion from unnecessary government interference."  146 Cong. Rec. E1234, E1235 (daily ed. July 14, 2000) (statement of Rep. Canady); see also Madison, 355 F.3d at 317; Mayweathers, 314 F.3d at 1068.  This Court has held that "where, as [in the case of section 2 of RLUIPA], a law's purpose is to alleviate significant interference with the exercise of religion, that purpose does not violate the Establishment Clause."  Midrash, 366 F.3d at 1241.  As discussed above in Part III.A.2, rehabilitation of prisoners is also a secular purpose underlying RLUIPA.  Although the Sixth Circuit reached the opposite conclusion in Cutter, it did not discuss rehabilitation as a purpose for

18

RLUIPA.  349 F.3d at 263-64.  In any event, our conclusion in <u>Midrash</u> is binding; RLUIPA has a permissible secular purpose.

### 2.  RLUIPA Does Not Advance or Inhibit Religion.

Georgia argues that RLUIPA violates the second part of <u>Lemon</u> by impermissibly advancing religion through endorsement in two ways: first, by providing unique advantages to religious prisoners solely on account of their religion, and, second, by imposing improper burdens on third parties.  Neither argument is persuasive.

### a.  RLUIPA Does Not Improperly Provide Religion Unique Advantages.

Georgia erroneously argues that by affording heightened protection for religious exercise relative to other fundamental rights, RLUIPA conveys an impermissible message of preference for religion in violation of the admonition of the Supreme Court that "government may not favor religious belief over disbelief." <u>County of Allegheny v. ACLU</u>, 492 U.S. 573, 593, 109 S. Ct. 3086, 3101 (1989).  Singling out free exercise rights for protection is not an impermissible endorsement of religion.  As the Fourth Circuit noted in <u>Madison</u>, the Supreme Court has not held that "legislative protections for fundamental rights march in lockstep." <u>Id.</u> at 318.  In fact, it is "reasonable for Congress to seek to reduce the burdens on religious exercise for prisoners without simultaneously

19

enhancing, say, an inmate's First Amendment rights to access pornography." Id. at 319.  If, as Georgia argues, protecting religious exercise rights alone reflects an impermissible bias in favor of religion, then protecting any fundamental right other than religion would reflect impermissible bias against religion.

Interpreting the Establishment Clause to require a rigid symmetry of protection for all fundamental rights would cut a broad swath through a forest of government programs and protections of religious exercise.  State and federal funds provide government chaplains for Congress and state legislatures, the armed forces, and prisons.  See, e.g., Marsh v. Chambers, 463 U.S. 783, 103 S. Ct. 3330 (1983).  Federal statutes accommodate religious apparel in the armed forces, 10 U.S.C. section 774, and exempt members of certain religious faiths from paying Social Security taxes, 26 U.S.C. section 1402(g).  Religious organizations may be exempted from paying generally applicable property taxes.  Walz v. Tax Comm'n of City of New York, 397 U.S. 664, 90 S. Ct. 1409 (1970).  Public schools may establish programs providing release time for the religious instruction of students.  Zorach v. Clauson, 343 U.S. 306, 72 S. Ct. 679 (1952).  At least twelve states, by statute or constitutional amendment, single out religious expression for special protection, including two states that submitted a brief to this Court as amici curiae in opposition to RLUIPA, 775 Ill. Comp. Stat. 35/1-35/99; Okla. Stat. Ann. tit. 51,

section 251, and two states in this circuit, Ala. Const. amend. 622; Fla. Stat. Ann. sections 761.01-761.04. States, including Georgia, exempt religious use of alcoholic beverages from laws setting the legal drinking age. See, e.g., Ala. Code § 28-3-15; Ariz. Rev. Stat. Ann. § 4-244; Colo. Rev. Stat. Ann. § 18-13-122; Fla. Stat. Ann. § 564.03(5); Ga. Code Ann. § 3-3-23; 235 Ill. Comp. Stat. Ann. 5/6-20; Ohio Rev. Code Ann. § 4301.69; S.C. Code Ann. § 61-6-4070; Wash. Rev. Code Ann. § 66.44.270; Wis. Stat. Ann. § 125.07. In Smith, after holding that the Free Exercise Clause does not mandate exemptions from generally applicable drug laws for the religious use of peyote, the Supreme Court affirmed the right of legislatures to protect religious exercise beyond the reach of the First Amendment and cited with approval state statutes exempting religious peyote use from general drug laws. Smith, 494 U.S. at 890, 110 S. Ct. at 1606. Today, 28 state statutes and a federal statute exempt religious peyote use. 42 U.S.C. § 1996a; H.R. Rep. No. 103-675, at 7 (1994), reprinted in 1994 U.S.C.C.A.N. 2404, 2409. A sweeping invalidation of all accommodations of religion is wholly inconsistent with the history, traditions, and laws of our nation.

Furthermore, this kind of argument was squarely rejected by the Court in Amos. The Court explained that, when the government exempted religious employers from the prohibition of discrimination based on religion, the

21

government was not bound to provide a corresponding benefit to secular

employers:

> [We have] never indicated that statutes that give special consideration
> to religious groups are per se invalid.  That would run contrary to the
> teaching of our cases that there is ample room for accommodation of
> religion under the Establishment Clause.  Where, as here, government
> acts with the purpose of lifting a regulation that burdens the exercise of
> religion, we see no reason to require that the exemption come packaged
> with benefits to secular entities.

Amos, 483 U.S. at 338, 107 S. Ct. at 2869.

We disagree with the Sixth Circuit, which held that the heightened

protection granted to religious exercise by RLUIPA "'violates the basic

requirement of neutrality embodied in the Establishment Clause.'"  Cutter, 349

F.3d at 266 (quoting Madison v. Riter, 240 F. Supp. 2d 566, 577 (W.D. Va. 2003),

overruled by  Madison, 355 F.3d at 322).  The Sixth Circuit distinguished Amos

on the ground that the exemption at issue was "arguably necessary to avoid an

Establishment Clause violation" and a "narrowly tailored solution to the potential

Establishment Clause problem."  Cutter, 349 F.3d at 268.  We find no such

language or distinction in the majority opinion in Amos.  On the contrary, the

language in Amos quoted above specifically rejected the neutrality argument

accepted by the Sixth Circuit.  Amos, 483 U.S. at 338, 107 S. Ct. at 2869.

Georgia also attempts to distinguish Amos by arguing that, under RLUIPA,

22

the government injects itself into religion instead of withdrawing from it.  This argument ignores that state prisons, which Georgia concedes employ chaplains and provide times and places for religious worship, are already necessarily involved in the religious exercises of prisoners, as in all other areas of their lives. Invalidating RLUIPA would not excise the state from the religious exercise of prisoners.

We recognize that the prison environment poses serious challenges to officials responsible for complying with RLUIPA, but these challenges "speak more to the wisdom of the law and to the disincentives for states to assume their RLUIPA obligations than to RLUIPA's validity under the Establishment Clause." Madison, 355 F.3d at 319.  In fact, the very nature of the prison environment compels our conclusion that RLUIPA does not violate the Establishment Clause. Given the necessarily strict rules that govern every aspect of prison life, the failure of prison officials to accommodate religion, even in the absence of RLUIPA, would not be neutral; it would be hostile to religion. As Justice Brennan explained more than forty years ago, "hostility, not neutrality, would characterize the refusal to provide chaplains and places of worship for prisoners and soldiers cut off by the State from all civilian opportunities for public communion .... " Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 299, 83 S. Ct. 1560, 1612 (1963)

23

(Brennan, J., concurring). The state may accommodate the religious exercise of its prisoners without necessarily affording all other rights equal deference.

### b. RLUIPA Does Not Unduly Burden Georgia.

Georgia argues that RLUIPA imposes on third parties costs and burdens that violate the Establishment Clause. Georgia cites Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 105 S. Ct. 2914 (1985), and Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 109 S. Ct. 890 (1989) (plurality), for the proposition that statutes exempting religious beneficiaries from generally applicable laws are unconstitutional when the exemptions burden third parties. In Caldor, the Court invalidated a statute that imposed substantial economic burdens on private parties in the process of removing privately-imposed burdens on religious exercise. 472 U.S. at 708-10, 105 S. Ct. at 2918. In Bullock, a plurality of the Court held that a Texas tax exemption for religious literature violated the Establishment Clause because the exemption applied only to religious literature and printers of non-religious literature would carry an additional tax burden to offset the benefit to religion. Bullock, 489 U.S. at 18 n.8, 109 S. Ct. at 901 n.8. Although these decisions suggest that some religious accommodations that economically burden third parties violate the Establishment Clause, RLUIPA does not create this sort of involuntary economic burden.

24

Georgia argues that RLUIPA will impose significant expenses on the DOC and prevent the DOC from providing other services, but if Georgia finds compliance with RLUIPA impractical, Georgia can refuse federal funds. The Fourth Circuit distinguished the statute in Caldor from RLUIPA by explaining that "Caldor concerned an unfunded mandate imposed on private employers to lift privately-imposed burdens on the religious exercise of employees. Here [the state] has voluntarily committed itself to lifting government-imposed burdens on the religious exercise of publicly institutionalized persons in exchange for federal correctional funds." Madison, 355 F.3d at 321. Bullock was no different; whatever burden may have fallen on non-religious taxpayers did so without their consent. Georgia cannot complain about the costs of RLUIPA, because Georgia consented to the costs when it accepted federal funds.

Georgia also erroneously argues that non-religious prisoners and prison staff will suffer substantial burdens when religious accommodations exempt certain prisoners from rules designed to serve health and safety concerns. If a requested exemption from health or safety rules is so serious as to place members of the prison community at risk, RLUIPA allows Georgia to deny the exemption so long as the challenged rule serves a compelling interest, such as prison safety, and the challenged rule is the least restrictive means of serving that interest.

History shows that strict scrutiny does not automatically invalidate all substantial burdens on religion, especially in prisons; under the same standard imposed by the Religious Freedom Restoration Act, the predecessor to RLUIPA, only a small percentage of prisoners' claims were successful. See Ira C. Lupu, Why the Congress was Wrong and the Court was Right–Reflections on *City of Boerne v. Flores*, 39 Wm. & Mary L. Rev. 793, 802-03 (1998). RLUIPA does not impose costs on states without their consent, and RLUIPA allows states to satisfy compelling interests, such as prison safety.

3. RLUIPA Does Not Entangle Excessively Georgia With Religion.

Georgia argues that RLUIPA excessively entangles the government with religion by requiring state prisons to "assess the validity of each religious request no matter how trite, expensive or disruptive" and "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds," but this argument fails for at least two reasons. First, the text of RLUIPA defeats this argument, as it defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). The Fourth Circuit recognized that this provision "mitigates any dangers that entanglement may result from administrative review of good-faith religious belief." Madison, 355 F.3d at

26

320. Second, the First Amendment already requires Georgia to determine whether the asserted belief of an inmate making a Free Exercise claim is religious and sincerely held. See, e.g., Martinelli v. Dugger, 817 F.2d 1499, 1503 (11th Cir. 1987), abrogated on other grounds by Harris v. Chapman, 97 F.3d 499 (11th Cir. 1996); Sutton v. Rasheed, 323 F.3d 236, 250-51 (3d Cir. 2003). Even the Sixth Circuit, the lone circuit to hold RLUIPA unconstitutional, suggested, without deciding the issue, that RLUIPA does little to increase existing government entanglement with religion. Cutter, 349 F.3d at 268. RLUIPA does not alter the nature of government entanglement with religion in the prison context.

Although Georgia urges us to hold Benning's requested kosher diet unconstitutional, the merits of Benning's complaint are not at issue in this interlocutory appeal. The district court has not yet held that RLUIPA compels Georgia to provide Benning with a kosher diet or allow him to wear a yarmulke, and we do not so hold. This issue and all remaining issues must be determined by the district court on remand.

## IV. CONCLUSION

Because section 3 of RLUIPA was validly enacted under the Spending Clause and does not violate either the Tenth Amendment or the Establishment Clause of the First Amendment, the judgment of the district court is

**AFFIRMED.**